IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Jeffrey M. Opsatnik,           )
                                )
           Plaintiff,         )
                                )
          vs.              )     Civil Action No. 06-81
                                )
Norfolk Southern Corp., *et al.*,    )
                                )
          Defendants.     )
                                )

AMBROSE, Chief District Judge

# OPINION
# AND
# ORDER OF COURT

Plaintiff, Jeffrey M. Opsatnik ("Plaintiff" or "Opsatnik"), initiated this action against his former employer, Defendant Norfolk Southern Corporation ("NSR"), and his former union, Brotherhood of Locomotive Engineers and Trainmen, a Division of the Rail Conference of the International Brotherhood of Teamsters, and Brotherhood of Locomotive Engineers and Trainmen Local Division No. 590 ("BLET") (collectively "Defendants"), alleging discriminatory treatment on the basis of race, sex, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* ("PHRA").

Pending before the Court are two motions for summary judgment filed by Defendants BLET and Norfolk Southern Corporation, respectively. (Docket Nos. 42, 43). Each Defendant seeks dismissal of Plaintiff's claims against it in their entirety. Plaintiff opposes both Motions. (Docket Nos.69, 70). After careful consideration of the parties' submissions and for the reasons set forth below, Defendants' motions are granted.

# I.  INTRODUCTION

## A.  Factual Background

Unless otherwise indicated, the following material facts are undisputed.

### 1.  General Background

Plaintiff Opsatnik is a Caucasian male born on October 15, 1959.  Plaintiff began his railroad employment when he was hired by Consolidated Rail Corporation ("Conrail") on August 22, 1994.  Plaintiff became an employee of NSR on June 1, 1999 after NSR acquired Conrail's assets.  During all relevant times, NSR was organized into 11 operational divisions, each of which was headed by a Division Superintendent.  Plaintiff worked as a locomotive engineer in NSR's Pittsburgh division from June 1, 1999 until his employment was terminated.

Upon joining NSR in June 1999, Plaintiff changed his union affiliation and became a member of BLET.  BLET is the collective bargaining representative of locomotive engineers employed by NSR.  The Railway Labor Act ("RLA") and the applicable collective bargaining agreement between NSR and BLET set forth detailed procedures for opposing discipline and provide employees several procedural safeguards to protect against arbitrary, excessive, or unfair discipline, including the right to appeal discipline to a Labor Arbitration Board such as a Public Law Board.  One part of the collective bargaining agreement negotiated by the parties effective January 1, 2000, is the "START policy," an acronym for System Teamwork and Responsibility Training policy.  See NSR's App'x (Docket No. 44) Exs. 3-4.

### 2.  Plaintiff's Disciplinary Record at NSR

Plaintiff was disciplined five times between April 24, 2001 and the termination of his NSR employment in September 2004.  On April 24, 2001, Plaintiff received a 10-day deferred suspension for failure to take calls on March 28 and 29, 2001, and for attempting to persuade the crew caller to falsify records.  Plaintiff states that this was a minor violation under the START policy.

Plaintiff signed a waiver accepting responsibility in connection with these violations. NSR's App'x, Ex. 5. On October 15, 2001, Plaintiff was counseled for a START violation for making an unauthorized shove move without permission. Plaintiff states that this, too, was only a minor START violation. On December 13, 2002, a 30-day deferred suspension was imposed on Plaintiff for operating his train in excess of the authorized speed in Conway Yard. In connection with this violation, Plaintiff signed a waiver, waiving his right to a formal hearing and accepting responsibility for the violation. Id., Ex. 6. Plaintiff states that he signed the waiver on BLET's advice. He also states that the violation was serious, not major, and was not the equivalent of "excessive speeding." On December 23, 2002, a 30-day deferred suspension was imposed on Plaintiff for failing to properly report a personal injury which occurred on October 27, 2002. Plaintiff appealed this suspension to the Special Board of Adjustment No. 1063, which, on July 29, 2004, rendered a decision upholding the suspension. Id., Ex. 7.

### 3. Plaintiff's Final Discipline And Termination From Employment

Plaintiff's fifth discipline, and the discipline that gives rise to this litigation, occurred when Plaintiff failed to comply with verbal instructions from a dispatcher with regard to weather-related speed restrictions during the operation of a train. Specifically, on September 8, 2004, Plaintiff was the engineer on an NSR "key" train (i.e., a train transporting hazardous materials). Plaintiff was accompanied on the trip by conductor Randy Zam. The normal speed limit for the train was 50 miles per hour. The train dispatcher in the area in which Plaintiff's train was operating, however, issued an area-wide speed limit directive, reducing all trains in the area to a maximum speed of 40 miles per hour. The reason for the speed limitation was that heavy storms were expected in the area. Upon the train's return to Conway Yard, it was discovered that Plaintiff and Zam's locomotive had not been properly secured.[1] As a result, NSR pulled and reviewed the train's event recorder

---

[1] Plaintiff claims that Zam failed to properly secure the locomotive.

which revealed that the train had exceeded the 40-mile per hour speed restriction eight times, including two instances where the train exceeded the normal track authorized speed of 50 miles per hour. Although Plaintiff offered explanations for his conduct, he admitted that he did not heed the reduced-speed directive.[2] As a result of Plaintiff's actions on September 8, 2004, NSR charged him with failure to properly secure a locomotive, improper train handling, and excessive speeding.

On September 21, 2004, a formal hearing pursuant to the collective bargaining agreement was held on Plaintiff's dismissal for excessive speeding before hearing officer Neville Wilson, an African-American NSR employee. At the time of the hearing, Wilson was terminal superintendent for the Conway Yard. At times during the hearing, Wilson noted Plaintiff's irresponsible attitude and that Plaintiff appeared to be sleeping. As a result of the hearing testimony, documentary evidence, and Plaintiff's prior record, Wilson found Plaintiff responsible for all violations with which he was charged and dismissed Plaintiff from service in all capacities.[3]

Pursuant to the collective bargaining agreement and the RLA, Plaintiff's union representative, Robert Salyers, appealed Plaintiff's dismissal to Mark Hamilton, Superintendent of NSR's Pittsburgh Division. Hamilton independently reviewed the September 21, 2004 hearing transcript and all related exhibits, and issued a letter denying the appeal. The BLET then appealed the dismissal to the Special Board of Adjustment, arguing, inter alia, that the penalty of removal was excessive and should be reduced. In an Award dated March 30, 2005, the Special Board of Adjustment denied the appeal and upheld Plaintiff's dismissal.

Plaintiff has never denied that he was advised of the speed restriction by the dispatcher or

---

[2] Among other things, Plaintiff explained to the local chairman of BLET Local 590, Robert Salyers, that he maintained normal track authorized speed rather than following the directive because his conductor (Zam) approved, and that he did not want to "outlaw" his train, i.e., have the train re-crewed because he had exceeded his permissible hours of service. Plaintiff also noted that the train arrived safely in Conway Yard and there were no adverse consequences to his actions.

[3] Conductor Zam, also a Caucasian male, was suspended, but not discharged for his role in the September 8, 2004 incident.

that he committed the speeding infractions with which he was charged. He argues, however, that NSR disciplined him more harshly than it disciplined African-American, female, and/or younger employees for similar infractions in violation of Title VII, the ADEA, and/or the PHRA. Plaintiff also argues that BLET acquiesced to this harsher discipline in violation of the same statutes. Defendants dispute Plaintiff's claims and seek summary judgment in their favor on all counts of Plaintiff's Complaint.

## B. Procedural History

On January 19, 2006, Plaintiff filed a Complaint against Defendants. (Docket No. 1). On March 10, 2006, Defendant NSR filed its Answer to Plaintiff's Complaint. (Docket No. 5). The BLET Defendants filed their Answer to the Complaint on March 15, 2006. (Docket No. 6). On June 4, 2007, Defendants filed the instant Motions for Summary Judgment and supporting materials. (Docket Nos. 42-45, 48-52). Plaintiff filed a Responsive Statement of Material Facts, Exhibits, and a Brief in Opposition to each Defendant's Motion. (Docket Nos. 59, 61-62, 69-70). Both Defendants filed Responses to Plaintiff's Statement of Additional Facts and Reply Briefs to Plaintiff's Opposition. (Docket Nos. 68, 72-74). Defendant NSR also filed supplemental exhibits to its Motion. (Docket Nos. 71, 77). Both Motions are now ripe for my review.

## II. LEGAL ANALYSIS

## A. Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. <u>Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id</u>. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id</u>. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>White v. Westinghouse Elec. Co.</u>, 862 F.2d 56, 59 (3d Cir. 1988) (quoting <u>Celotex</u>, 477 U.S. at 322).

### B. Plaintiff's Claims Against NSR

### 1. "Reverse" Race and Gender Discrimination - Title VII and PHRA[4]

NSR alleges that it is entitled to summary judgment as to Plaintiff's "reverse" race and gender discrimination claims because Plaintiff cannot establish a *prima facie* case of discrimination and/or there is no genuine issue of material fact that NSR's reason was a pretext for discrimination.

---

[4] My analysis of Plaintiff's ADEA and Title VII claims applies equally to his age, race, and gender discrimination claims under the PHRA. <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996).

Plaintiff alleges that he was fired by NSR because of his race (Caucasian) and/or his gender (male) in violation of Title VII and the PHRA.

In determining whether or not to grant summary judgment in a "reverse" employment discrimination case, I must apply the burden-shifting analysis established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir. 1999).[5] To prevail under the burden shifting analysis, Plaintiff must first establish a *prima facie* case of discrimination, which, in the reverse discrimination context, requires the plaintiff to "present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." Id. at 161; Mosca v. Cole, 217 F. App'x 158, 161 (3d Cir. 2007); Geddis v. Univ. of Del., 40 F. App'x 650, 652 (3d Cir. 2002). The primary purpose of evaluating the *prima facie* case is to "eliminate the most obvious, lawful reasons for the defendant's action," <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 352 (3d Cir. 1999), and the plaintiff's evidentiary burden at this stage is "not intended to be onerous." <u>Marzano v. Computer Sci. Corp.</u>, 91 F.3d 497, 508 (3d Cir. 1996).

If a plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>See Burdine</u>, 450 U.S. at 254-56. The defendant satisfies this burden by introducing evidence, which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). If the defendant meets this minimal burden, then the plaintiff must prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination. <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997). Throughout this analysis, the ultimate burden

---

[5] Both parties agree that this case should proceed under the <u>McDonnell Douglas</u> burden-shifting analysis and not under the direct evidence theory of liability set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989).

of proving intentional discrimination rests with the plaintiff.  Fuentes, 32 F.3d at 763.

## a.  Prima Facie Case

NSR first argues that Plaintiff cannot meet his burden of proving a prima facie case of reverse gender and/or race discrimination because there is no evidence of similarly-situated female and/or non-Caucasian employees who were treated more favorably than Plaintiff.   Plaintiff disagrees and points to a list of alleged comparators he claims received less severe discipline for similar infractions.   Although, for the reasons set forth infra, I find that NSR's arguments have considerable force, I also recognize that the burden of establishing a prima facie case is much less onerous than proving pretext with similar evidence.  See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998).  I do not need to resolve this question, however, because even assuming arguendo that Plaintiff has established a prima facie case, I find, for the reasons set forth below, that NSR has articulated a legitimate, nondiscriminatory reason for terminating his employment, and Plaintiff cannot point to sufficient evidence from which a fact finder could conclude that NSR's stated reason was a pretext for discrimination.

## b.  NSR's Articulated Reason

NSR's articulated reason for terminating Plaintiff's employment is that, while driving a "key train" containing hazardous materials on September 8, 2004, Plaintiff disregarded specific instructions from a train dispatcher to reduce his speed, and operated his train over the speed limit multiple times during the same trip.  NSR's Br. (Docket No. 45) at 15-16.  Hearing officer Neville Wilson made the decision to discharge Plaintiff after an investigative hearing, and Division Superintendent Mark Hamilton upheld that decision on appeal.  Plaintiff's union (Defendant BLET) further appealed his dismissal to Special Board of Adjustment No. 1063, which also upheld Plaintiff's discharge.   In its written findings denying Plaintiff's appeal, the Special Board of Adjustment stated, among other things:

We note that this was not Claimant's first discipline for speeding. In December 2002, Claimant was issued a thirty day suspension for speeding. This Board, on previous occasions, has recognized that speeding is a serious violation that may warrant dismissal. Claimant's disregard for the Carrier's rules is magnified when one considers that his train was designated a key train because of the number of cars carrying hazardous materials. Claimant was not only over the speed limit for all trains because of the weather conditions, but was in excess of the speed limit for key trains under ideal conditions. The Board is particularly aware of the consequences of derailments involving hazardous materials.

Docket No. 50, Ex. 15.

I find that NSR's articulated reason is a more than legitimate nondiscriminatory reason for discharge. See, e.g, Messina v. E.I. Dupont de Nemours & Co., 141 F. App'x 57, 60 (3d Cir. 2005) (violation of safety rule reason for legitimate, nondiscriminatory discharge). Because NSR has satisfied its burden of production in this regard, the burden of persuasion is on Plaintiff to show pretext.

### c. Pretext

"To survive summary judgment when the employer has articulated a legitimate, non-discriminatory reason for its action, the plaintiff must point to some evidence . . . from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely or not a motivating or determining cause of the employers action." Simpson, 142 F.3d at 644 (quoting Fuentes, 32 F.3d at 764); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). To discredit the employer's articulated reasons (the first method of proving pretext), the plaintiff

need not "produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond [his] prima facie case." Id. (citations omitted). The plaintiff must, however, point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action."

Id. (quoting Fuentes, 32 F.3d at 764-65).

To show that discrimination was more likely than not a cause for the employer's action (the second method of proving pretext), "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's age, race, gender, and/or other protected trait, "was a motivating or determinative factor in the employment decision." Id.   Among other things, the plaintiff may show that the employer: (1) has previously discriminated against him; (2) has discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) that the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645 (citing Fuentes). The burden of proving pretext is a difficult one, Fuentes, 32 F.3d at 765; Kautz, 412 F.3d at 467, and one that Plaintiff cannot meet in this case.

As an initial matter, I note the particular strength of NSR's articulated reason for discharge in this case.  First, Plaintiff admits (and admitted at the time) that he engaged in the behavior (i.e., speeding) with which he was charged.  Plaintiff also acknowledges that excessive speeding is a major offense – the highest level of offense – under NSR's START policy and that the START policy expressly allows NSR to dismiss an employee from service for even one major offense if proven guilty.  See NSR's App. (Docket No. 50), Ex. 4.  It also is undisputed that Plaintiff was found guilty of excessive speeding after an investigative hearing and that his dismissal was upheld both by the Division Superintendent and after an independent review by the Special Board of Adjustment.[6] Id., Exs. 10, 13, 15.  Further, the dangers of speeding while driving a train, especially a train carrying hazardous materials, cannot be understated.  Even Plaintiff admits that speeding can result in serious death or injury both to railroad workers and members of the general population as well as significant property damage.  Pl.'s Resp. to NSR's St. Mat. Facts (Docket No. 61) ¶ 42. The record evidence also demonstrates that NSR recognized the dangers of excessive speeding

_____

[6]  These procedural safeguards were followed as provided by the applicable collective bargaining agreement and the Railway Labor Act.

and communicated those dangers to its employees.  See id. ¶ 41; NSR's St. Mat. Facts (Docket No. 44) ¶ 41; NSR's App., Exs. 4, 16-19.

In an effort to overcome these admissions and demonstrate pretext, Plaintiff offers a number of arguments as to why NSR's reason for discharge is nevertheless implausible.  Pl.'s Br. Opp. (Docket No. 70) at 27-29.  None of these arguments is persuasive.

### (1) Comparator Evidence

As set forth above, Plaintiff has never denied that he engaged in the behavior with which he was charged.  Rather, Plaintiff's overarching argument in support of his discrimination claims is that NSR disciplined him more severely for that behavior than it disciplined African-American and/or female employees.  This argument fails, however, because the individuals to whom Plaintiff points were not similarly-situated to him or did not commit comparable offenses and, therefore, are not valid comparators for purposes of demonstrating pretext.

Although a plaintiff may use evidence that he was disciplined more severely than employees of a different race or gender who committed comparable offenses to show pretext, such evidence is relevant only if the comparators and the plaintiff are "similarly situated."  Maull v. Div. of State Police, 39 F. App'x 769, 773 (3d Cir. 2002) (citing Fuentes, 32 F.3d at 765).  Although "similarly situated" does not mean "identically situated," the plaintiff generally must demonstrate that he was similar to the alleged comparators in all relevant aspects.  See Williams v. Potter, Civil Action No. 07-02, 2008 WL 282349, at *3 (W.D. Pa. Jan. 31, 2008); Red v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  In the discipline context, a plaintiff must show that the alleged comparator's acts "were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]."  Tyler v. SEPTA, No. Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov.8, 2002) (alterations in original), aff'd, 85 F. App'x 875 (3d Cir.

2003); see also Jackson v. Bob Evans-Columbus, No. 2:04cv559, 2006 WL 3814099, at *7 (W.D. Pa. Dec. 22, 2006); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002) ("Showing that an employee is similarly situated is no easy task."). Whether alleged comparators are indeed similarly situated is a case-specific analysis, and one which is appropriate for the district court to evaluate at the summary judgment stage. Maull, 39 F. App'x at 769 (citing Simpson, 142 F.3d at 645).

Here, Plaintiff provides in his brief a summary of nineteen "primary examples" of African-American and/or female NSR engineers and conductors whom he claims are similarly situated and received lesser discipline for comparable offenses. Pl.'s Opp. Br. at 9-14. According to Plaintiff, twelve of these individuals – EC, VP, CR, EK, LT, RJ, TH, JR, GC, TN, ES, and MA[7] – committed operational violations more severe than Plaintiff's violation and were not discharged. Of these twelve, seven (EC, VP, CR, EK, LT, RJ, and TH) are African-American males and three (GC, ES, and MA) are Caucasian females. Two, JR and TN, are African-American females. See Pl.'s Opp. Br. at 9-12. Plaintiff contends that the remaining seven alleged comparators – JRB, ET, KR, EA, EST, RF, and LR – committed non-operational violations involving absenteeism and drug-and-alcohol issues. Of these seven, JRB, ET, KR, EA, EST, and RF are African American males and LR is a Caucasian female.

A close examination of the undisputed facts, however, reveals that these alleged comparators are not similarly situated to Plaintiff. As an initial matter, the majority of the alleged comparators – TN, VP, CR, EK, LT, RJ, TH, JR, TN, and RF – did not work in the Pittsburgh division, and there is no evidence that they were ever supervised and/or disciplined by Mr. Wilson or Mr. Hamilton, the decisionmakers in this case. Accordingly, the discipline these individuals did or did not receive does not cast doubt on NSR's articulated reason for discharging Plaintiff and is

---

[7] Pursuant to a prior Order of Court in this case, I am using only initials to protect the privacy of these individuals.

not evidence that Mr. Wilson or Mr. Hamilton acted with discriminatory intent.

Plaintiff's argument that the law does not require that employees have the same supervisor to be similarly situated does not change this result. See Pl.'s Opp. Br. at 17-20. I agree with Plaintiff that there is no per se "same supervisor" rule in the "similarly-situated" analysis. See Sprint/United Mgmt. Co. v. Mendelsohn, 128 S. Ct. 1140, 1147 (2008). I disagree, however, that the identity of the supervisor/decisionmaker is irrelevant in this case. Even the cases Plaintiff cites in his brief recognize that whether comparators had the same supervisor is often relevant to the similarly-situated analysis in discipline cases. See, e.g., Johnson v. Kroger Co., 319 F.3d 858, 867 (6th Cir. 2003) (citing Ercegovich, 154 F.3d at 352). As set forth above, it is particularly relevant here, where the question is whether hearing officer Wilson's stated reason for discharging Plaintiff, as affirmed by Mr. Hamilton, is pretextual. The discipline imposed by other hearing officers on conductors or engineers working under different supervisors in other NSR divisions simply does not speak to whether Mr. Wilson or Mr. Hamilton acted with discriminatory intent in this case.[8]

For similar reasons, it is unhelpful to compare Plaintiff's termination to discipline former Conrail conductors and engineers, including EC, GC, TN, and MA, received prior to NSR's

---

[8]Perhaps recognizing this, Plaintiff argues in his opposition brief that the relevant supervisor is Scott Weaver, NSR's National Director of Labor Relations, because Mr. Weaver made the final decision to affirm Mr. Wilson and Mr. Hamilton's termination decision prior to arbitration. Pl.'s Opp. Br. at 20. This argument is without merit. As NSR notes, there is no evidence that Mr. Weaver played any substantive role in disciplining Plaintiff or any other alleged comparator. To the contrary, the evidence indicates that the Pittsburgh division employees (Wilson and Hamilton) were responsible for charging Plaintiff with misconduct and assessing discipline and that Mr. Weaver would not overturn a dismissal absent Mr. Hamilton's agreement.

Plaintiff also seeks to overcome the common supervisor issue by suggesting that the Court already resolved this question in his favor when it ordered NSR to produce disciplinary records for employees in the three geographical divisions adjacent to Pittsburgh in connection with Plaintiff's claim of a company-wide pattern and practice of reverse discrimination. Pl.'s Opp. Br. at 20. This argument is likewise unpersuasive. As NSR notes, relevancy in Rule 26 is not the equivalent of relevancy at trial. Rather, discovery is permitted to the extent it could lead to admissible evidence. Unfortunately for Plaintiff, it did not lead to such evidence in this case. Even viewing the records in the light most favorable to Plaintiff, no reasonable jury could conclude that he was a victim of a company-wide practice of reverse discrimination or that Mr. Wilson or Mr. Hamilton acted with discriminatory intent.

acquisition of Conrail in 1999. Not only is such discipline remote in time, but Conrail was a separate employer not a party to this case. In addition, neither Mark Hamilton nor Neville Wilson was ever employed by Conrail. See Hamilton Decl. ¶¶ 5-11, 14 (Docket No. 50, Ex. 3);Wilson Dep. (Docket No. 62), at 10. Moreover, while Conrail discipline may appear on employees' career service records, the record evidence indicates that NSR did not include Conrail violations (all of which occurred prior to the START program) when assessing discipline. See id.; see also Hamilton Dep. (Docket No. 50, Ex. 11), at 201.

In addition to those who worked outside of the Pittsburgh division or were disciplined by Conrail, many of Plaintiff's alleged comparators are not similarly situated to him because they did not commit a sufficiently similar offense or group of offenses. Although similarly situated employees do not need to be guilty of exactly the same offense to be valid comparators, a plaintiff and his alleged comparators must have engaged in acts of "comparable seriousness." See Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir. 2006); Elmore v. Capstan, Inc., 58 F.3d 525, 530 (10th Cir. 1995). The comparators to whom Plaintiff cites, however, do not fall within this category.

As an initial matter, Plaintiff stretches this concept too broadly when he suggests that any "major" offense under NSR's START program (or allegedly equivalent combination of minor and/or serious offenses) is automatically comparable to Plaintiff's excessive speeding offense. Not only does START's "major" category encompass a wide variety of different types of offenses, but the relative seriousness of each individual violation may vary depending on the facts and circumstances of each case.

To the extent Plaintiff attempts to compare himself to minority employees who committed non-operational violations such as excessive absenteeism or missed calls, this argument fails because employee attendance issues, however serious, simply do not equate to egregious operational safety violations such as excessive speeding. Similarly, Plaintiff cannot successfully

compare himself to employees who committed drug and alcohol violations (i.e., "Rule G" violations) and were offered reinstatement through NSR's Drug and Alcohol Rehabilitation Services program ("DARS"). NSR's DARS brochure plainly states that participation in DARS will not jeopardize employee jobs because "DARS is designed to help employees overcome debilitating – and sometimes deadly – drug and alcohol addiction." <u>See</u> NSR's App'x, Ex. 42. NSR certainly is entitled to treat drug and alcohol-related infractions differently than other violations, and its business decision to do so is not evidence of discrimination.[9]

Moreover, Plaintiff has failed to identify any employees who committed operational violations of comparable seriousness to his. The only Pittsburgh employees Plaintiff names in his brief who committed any type of speeding violation are EC and EA. As NSR notes, however, unlike the excessive speeding violation that led to Plaintiff's discharge, EC and EA's speeding violations were their first as NSR employees.[10] In addition, there is no evidence that EC or EA intentionally disregarded a safety directive from a dispatcher or were driving a train carrying hazardous materials. The other operational violations to which Plaintiff cites, including passing a stop signal, are likewise not comparable under the facts of this case because, as with the speeding violations at issue, there is no evidence that any of these violations involved any of the aggravating factors that NSR claims led to Plaintiff's dismissal in this case.[11]

---

[9] NSR also has provided a declaration from Mark Hamilton identifying a number of Caucasian male employees with significant missed call histories who were not terminated as well as a list of Caucasian male employees who violated Rule G but were reinstated through the DARS program. Hamilton Decl. ¶¶ 25, 40 (Docket No. 50, Ex. 3). For this reason as well, Plaintiff's arguments are not indicative of reverse discrimination. <u>See Simpson</u>, 142 F.3d at 646-47 (plaintiff cannot pick and choose his comparators).

[10] Although Plaintiff argues that EC had two speeding violations, EC's "first" violation occurred in 1996 while he was employed by Conrail. For the reasons set forth <u>supra</u>, EC's disciplinary history with Conrail is not a relevant consideration in this case.

[11] In looking at these factors, I am not holding that other violations such as passing a stop signal are <u>per se</u> incomparable to a speeding violation. I must focus, however, on the criteria for termination identified by the employer, including the aggravating factors such as Plaintiff's prior speeding offense, his admitted intentional disregard of the speeding directive, and the fact he was driving a key train. This is

In short, even viewing the facts in the light most favorable to Plaintiff, he has failed to produce evidence of similarly-situated comparators from which a reasonable fact-finder could conclude that NSR's articulated reasons for Plaintiff's discharge were pretextual. To the contrary, the evidence indicates that Plaintiff's race and/or gender did not play a role in the discharge decision.[12] Accordingly, I must turn to Plaintiff's other evidence of pretext.

## (2) Other Arguments

Plaintiff's remaining arguments in support of his race and gender discrimination claims are likewise without merit. The first three of these arguments amount to little more than Plaintiff's opinion as to why his discipline was excessive under the circumstances. First, Plaintiff argues that NSR's reliance on his prior speeding violation as a factor in deciding to discharge (as opposed to suspend) him for the September 8, 2004 speeding incident is pretextual because the first violation (for speeding in the yard) was only a "serious" violation under the START program and not a "major" violation like the September 2004 excessive speeding charge. Pl.'s Br. Opp. at 27. Second, Plaintiff claims there is no support for NSR's contention that speeding is a more severe offense on the railroad than other major violations he did not commit such as violating stop signals, derailing trains, and substance abuse. Id. Third, Plaintiff insists that NSR should have taken into account the fact that, despite the potential for significant adverse consequences, no such consequences occurred in his case. Id. at 28.

As an initial matter, there is no evidence indicating that NSR was required to impose lesser

---

especially true during the pretext stage of the analysis. If plaintiff had pointed to evidence of a minority employee with a similar disciplinary history who had passed a stop signal while driving a key train or in hazardous conditions or in violation of a directive from a dispatcher, yet was not discharged, that employee may be similarly situated to plaintiff despite the fact that they committed different violations. There is no such evidence in this case.

[12] Indeed, Randy Zam, Plaintiff's conductor during the September 8, 2004 incident, a Caucasian male, and perhaps Plaintiff's closest comparator attended the same hearing as Plaintiff before Mr. Wilson but was suspended rather than discharged. This is further evidence that NSR's based its decision to terminate rather than suspend Plaintiff on factors other than gender and race.

discipline in Plaintiff's case.  To the contrary, Plaintiff admits that NSR's START policy permitted dismissal from employment for even a first major offense, including the offense of excessive speeding.[13]  Plaintiff's personal belief that NSR should have imposed a lesser sanction in his case based on mitigating factors is simply not proof of pretext.  See Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) ("[T]he fact that an employee disagrees with an employer's evaluation [of his performance or misconduct] does not prove pretext."); Jackson, 2006 WL 3814099, at *7.  It is well-established that "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765); see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination.").  As the Court of Appeals for the Third Circuit has made clear, "an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason. [W]e do not sit as a super-personnel department that reexamines an entity's business decisions."  Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995); see also Kautz, 412 F.3d at 468 (generally, the court "will not second guess the method an employer uses to evaluate its employees").[14]

In his fourth argument that NSR's reason is "implausible," Plaintiff primarily rehashes his

---

[13]  Contrary to the suggestion in Plaintiff's opposition brief, the deposition testimony of Neville Wilson and Mark Hamilton does not support the proposition that, in all circumstances, "[t]he absence of adverse consequences will reduce the severity of discipline for a particular violation, or will place the violation in a lesser disciplinary category."  Pl.'s Opp. Br. at 28.  Wilson and Hamilton testified only that the lack of adverse consequences is a factor to be considered, not that the lack of such consequences precludes dismissal.  It is not my role (nor Plaintiff's) to second guess NSR's business decision that the potential for severe adverse consequences in Plaintiff's case warranted dismissal.

[14]  Plaintiff also reiterates throughout his summary judgment materials that he did not heed the dispatcher's reduced-speed directive because, inter alia, he did not want to "outlaw" his train; he did not observe any standing water on the tracks (and was told by a train in front of him that there was no such water); and his conductor told him it was alright not to reduce his speed.  An employee's explanation of the reasons for his conduct, however, is not evidence of pretext.  See Kautz, 412 F.3d at 475-76.

contention that he should have been suspended rather than discharged because the September 8, 2004 incident was his first "major" violation under START.  Pl.'s Opp. at 28.  As set forth above, NSR policy does not require such progressive discipline, and Plaintiff's opinion in this regard is not evidence of pretext.   To the extent Plaintiff further implies in his fourth argument that the true reason he was discharged rather than suspended is because the key decisionmaker (hearing officer Neville Wilson) is African-American, such argument is patently without merit.  See Iadimarco, 190 F.3d at 156 (the "mere fact" that key decisionmakers are black, without more, is insufficient to infer even a prima facie case of discrimination).  There is not any record evidence suggesting that Wilson's race played any role in his decision to discharge Plaintiff.

Finally, Plaintiff appears to cite to NSR's diversity initiatives as evidence of a corporate "culture of affirmative action" encouraging reverse discrimination.[15]  Pl.'s Opp. Br. at 28-29; see also id. at 7-8; Complaint ¶ 13j.  I firmly disagree.  As NSR correctly notes, the law allows and even encourages race neutral methods to achieve diversity.  See NSR's Reply Br. (Docket No. 72) at 5. As one court within this Circuit has explained:

> Such diversity awareness programs . . . ensure that companies . . . have the ability to hire a workforce that will enable it to effectively service an increasingly diverse customer base.  This is to say nothing of the laudable goal of expanding the horizons of opportunity for more and more members of this great pluralistic society. To be sure, this is not to say that Caucasian males should now be discriminated against.  No contrary conclusion is supported by the record presently before the court.

Reed v. Agilent Techs., Inc., 174 F. Supp. 2d 176, 186-87 (D. Del. 2001).   I agree with the court in Reed that to use diversity concerns, without more, as evidence of discrimination would be irresponsible.  See id.  In connection with this argument, Plaintiff also cites to the opinion testimony

---

[15]  In support of this contention, Plaintiff cites to his statement of material facts in which he refers to specific initiatives NSR instituted in 2001 pursuant to a consent decree entered into in an unrelated class action, including training about diversity, the creation of a "diversity council," honoring each February as "African-American Railroader Month," and naming a facility in honor of Martin Luther King, Jr.  Pl.'s Opp. Br. at 28-29 (citing Pl.'s Resp. to NSR's Stat. Mat. Facts ¶¶ 167-171).

of Paul Hamrick (a union official and former NSR employee who retired from a different division of NSR over a year prior to the speeding incident in this case) that NSR applies its disciplinary process more harshly to white males over age 40 than to African American, female or younger engineers and conductors.  Pl.'s Opp. Br. at 28-29 (citing Pl.'s Resp. to NSR's Stat. Mat. Facts ¶¶ 174-177).   A close reading of Mr. Hamrick's deposition testimony, however, reveals that his opinions are themselves conclusory and unsupported and, therefore, are not evidence of pretext or discrimination.  See Jalil v. Advel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (conclusory allegations of discrimination are insufficient to defeat summary judgment); Jackson, 2006 WL 3814099, at *7.

For all of these reasons, Plaintiff has failed to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the NSR's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.  Plaintiff likewise has failed to offer any evidence from which a reasonable jury could conclude that his race and/or gender were more likely than not a motivating or determinative cause of his discharge.  Accordingly, NSR's motion for summary judgment as to Plaintiff's reverse race and gender discrimination claims is granted

### 2.  Age Discrimination Claim - ADEA and PHRA

Plaintiff also argues that NSR discriminated against him in violation of the ADEA and PHRA because it disciplined younger employees less severely for similar offenses.  To establish a *prima facie* case of age discrimination, a plaintiff must show: (1) he is at least 40 years of age; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) non-members of the protected class were treated more favorably (or there are other circumstances giving rise to an inference of age discrimination).  See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1102 (3d. Cir. 1997).  Again, although NSR argues that Plaintiff cannot meet prong four of this standard, I do not need to resolve this issue because assuming arguendo Plaintiff can show a prima facie case, his claim fails at the more rigorous pretext stage of the summary judgment analysis.

Plaintiff points to six alleged similarly-situated younger NSR conductors or engineers – EK, DH, JD, JB, JM, and TS – whom he claims committed comparable violations yet received less severe discipline. For reasons similar to those discussed with respect to Plaintiff's gender and race reverse discrimination claims, these comparators had sufficient differentiating or mitigating circumstances that they are not similarly situated to Plaintiff. Among other things, at least four of the six alleged comparators – EK, DH, JD, and TS – were not part of the Pittsburgh division and were not evaluated or disciplined by Mr. Wilson or Mr. Hamilton. Of the remaining two, there is no evidence that JM committed any violation similar to that for which NSR discharged Plaintiff. Finally, although it appears that JB's violations included speeding, the record indicates that NSR fired JB after his second excessive speeding violation in June 2004.[16]

Most of Plaintiff's remaining arguments that NSR's articulated reason for his discharge is a pretext for age discrimination are largely the same as his arguments in support of his race and gender discrimination claims. For the reasons set forth in Section II.B.1.c(2), supra, these arguments are without merit.

The only argument that pertains uniquely to Plaintiff's age discrimination claim is Plaintiff's testimony that Mark Hamilton (the then-Division Superintendent that affirmed Plaintiff's discharge at the first level of appeal) remarked to Plaintiff that "it seems as though guys your age are getting a lot more injuries on my railroad these days." Pl.'s Br. Opp. at 29. According to Plaintiff, Hamilton made this statement approximately three years prior to his discharge, while he was driving Plaintiff to a medical examination after Plaintiff reported suffering a groin injury at work.

Even if true, however, Mr. Hamilton's alleged statement is insufficient evidence of pretext.

---

[16] The record further indicates that NSR also dismissed JB after his first speeding violation in November 2002 but that he was returned to service in February 2003. NSR also discharged JB for failing to obey a stop signal in June 2003, but that decision was overturned in arbitration by the Special Board of Adjustment. Thus, even if JB were a relevant comparator, which he is not, NSR treated him similarly, if not more harshly, than Plaintiff.

It is well-established in the Third Circuit that "[s]tray remarks by non-decisionmakers or decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); see also Wimberly v. Severn Trent Servs., Inc., Civ. Action No. 05-2713, 2007 WL 666767, at *5 (E.D. Pa. Feb. 26, 2007) (remark by decisionmaker made nine months prior to plaintiff's transfer that "it's time for us to mentor someone younger and pass our knowledge on" was insufficient evidence of pretext). Here, even if I consider Hamilton a decisionmaker with respect to Plaintiff's discharge, his alleged comment was entirely unrelated to that decision process and was made almost three years prior to the date of the termination decision. Thus, the comment is at best a classic "stray remark" and is not sufficient evidence of age discrimination.

For all of the above reasons, I find that Plaintiff has failed to rebut NSR's nondiscriminatory reason for his discharge and there is no evidence from which a reasonable factfinder could find that reason was a pretext for age discrimination.

## C. Plaintiff's Claims Against BLET

Plaintiff also has brought Title VII and PHRA claims against his union, BLET, arguing that BLET "shirked its duty to properly represent Plaintiff and instead acquiesced and joined in [NSR's] racial and gender discrimination against him." Complaint ¶ 13l.[17] Plaintiff contends that BLET was aware that similarly situated African-American and/or female employees had received more favorable discipline for committing major violations but did not pursue this argument when appealing Plaintiff's discharge. Id. ¶ 13m. Thus, according to Plaintiff, BLET "cooperated and aided and abetted [NSR] in its discriminatory practice of administering discipline and/or adverse job actions disparately according to the race and/or sex of the employee being disciplined." Id.

---

[17] Plaintiff appears to have abandoned his age discrimination claim against BLET. See BLET's Br. at 16 n.3. Accordingly, BLET's motion for summary judgment is granted as to these claims.

BLET's motion for summary judgment as to Plaintiff's claims is granted. As an initial matter, to the extent Plaintiff is merely repackaging a breach of a duty of fair representation claim under the RLA as a federal discrimination claim, such claim is barred by the applicable statute of limitations. The union's duty of fair representation arises from the obligations imposed on unions under the RLA, 45 U.S.C. § 151, et seq. This statutory duty requires the union to represent bargaining unit employees honestly and in good faith without invidious discrimination or arbitrary conduct. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570 (1976); Airline Pilots Ass'n , Int'l v. O'Neill, 499 U.S. 65, 76 (1991). A breach of the duty of fair representation occurs when the union's conduct toward a member of the collective bargaining unit is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967); O'Neill, 499 U.S. at 67.

It is well-established that "the statute of limitations for a duty of fair representation claim against a union under the RLA is six months." Bensel v. Allied Pilots Ass'n, 387 F.3d 298, 304 (3d Cir. 2004); Sisco v. Consol. Rail Corp., 732 F.2d 1188, 1194 (3d Cir. 1984). Where a union represents an employee in an arbitration proceeding, the employee's cause of action generally accrues when the arbitration board denies the employee's claim. See Bensel, 387 F.3d at 307; Whittle v. Local 641, 56 F.3d 487, 490 (3d Cir. 1995); Childs v. Pa. Fed'n Bhd. of Maint. Way Employees, 831 F.2d 429, 436 (3d Cir. 1987).

Here, the latest a DFR claim could have accrued was March 30, 2005, when the Special Board of Adjustment issued its award denying Plaintiff's grievance. Plaintiff, however, did not file the instant action until January 19, 2006 – well after the six-month statute of limitations expired. Because any DFR claim would be untimely, Plaintiff's claims against BLET must be dismissed to the extent that the substance of those claims boils down to a garden-variety claim that the BLET breached its duty of fair representation. See Johnson, 828 F.2d at 967.

Plaintiff argues that the statute-of-limitations argument is not dispositive because a union's breach of the duty of fair representation may subject it to Title VII liability when the breach itself is

discriminatory. In support, Plaintiff relies on a line of federal cases out of the Southern District of New York recognizing this theory as a viable cause of action under Title VII. See, e.g., Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 498 (S.D.N.Y. 2000) ("It is well established that a union's breach of its duty of fair representation may render it liable under Title VII."); Gorham v. Transit Workers Union of Am., No. 98 Civ. 313(JGK), 1999 WL 163567 (S.D.N.Y. Mar. 24, 1999); Nweke v. Prudential Ins. Co. of Am., 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998); Morris v. Amalgamated Lithographers of Am., 994 F. Supp. 161 (S.D.N.Y. 1998); see also 42 U.S.C. § 2000e-2(c)(1) (It is unlawful for a union to "exclude or expel from its membership, or otherwise discriminate against, any individual because of his race, color, religion, sex or national origin."). Under these cases, the Title VII statute of limitations, and not the six-month RLA statute of limitations, would control. Cooper, 106 F. Supp. 2d at 500; Blaizin v. Caldor Store #38, No. 97 Civ. 1604(DAB), 1998 WL 420775 (S.D.N.Y. July 27, 1998).

Even under this theory, however, Plaintiff's claims against BLET cannot survive BLET's motion for summary judgment. The crux of Plaintiff's argument is that BLET, "through not listening to Plaintiff's suggestions to delve into [his] employer's discriminatory practices, essentially ratified the employer's discriminatory practice." Pl.'s Br. Opp. (Docket No. 69) at 6. In support, Plaintiff cites cases indicating that "a union's role in ratifying an employer's discriminatory practice could be sufficient to compel a finding of liability against it." Nweke, 25 F. Supp. 2d at 220. These cases, however, also hold that a union "cannot be said to have condoned or ratified a discriminatory practice [under this theory] absent a showing of discrimination on the part of [the employer]." Id. at 224. As set forth in Section II.B, supra, Plaintiff has failed to make such a showing against NSR. Accordingly, his "union acquiescence" theory against BLET likewise must fail. See Nweke, 25 F. Supp. 2d at 224.

To the extent Plaintiff further argues that BLET affirmatively discriminated against him on the basis of his race and gender because it did not pursue a discrimination claim against NSR, this

claim is likewise without merit.  To make out a prima facie case of a breach of the duty of fair representation under the line of case law on which Plaintiff relies, he must demonstrate: (1) that the union breached its duty of fair representation by allowing an alleged breach of the collective bargaining agreement to go unrepaired; and (2) that the union's actions were motivated by gender or racial animus.  Cooper, 106 F. Supp. 2d at 502.  Here, there is no evidence that BLET's actions (or inactions) were in any way motivated by discriminatory animus or that BLET handled Plaintiff's grievance any differently than it handled grievances made by female or African-American employees.  See Nweke, 25 F. Supp. 2d at 223.

In addition, there is no evidence that BLET breached its duty of fair representation.  As set forth above, a union breaches its duty of fair representation "only when its conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."  Gorham, 1999 WL 163567, at *3 (citing O'Neill, 499 U.S. at 76).  "Union members cannot expect that their Union's conduct during the grievance and arbitration process will be error-free," and, thus, "mere proof of an error in judgment is insufficient to sustain a member's burden of showing that his union breached its duty of fair representation."  Id.  Here, even assuming that BLET made a tactical error by arguing that the Plaintiffs's discipline was excessive rather than that Plaintiff was treated differently because of his race or gender, this is not sufficient to show "bad faith," especially where, as here, there is no evidence (other than Plaintiff's conclusory and unsupported allegations) that BLET could substantiate such a claim or could obtain information from NSR to support such a claim.  If anything, the undisputed evidence of record demonstrates that BLET vigorously represented Plaintiff's interests despite overwhelming evidence against him by, inter alia, representing Plaintiff in the grievance hearing, cross-examining NSR's witnesses, asserting that the penalty of discharge was excessive, writing a letter of appeal to management, and further appealing the case to arbitration again arguing for a reduced penalty.

### III.  <u>CONCLUSION</u>

For all of these reasons, I find that based on the evidence of record, even when viewed in the light most favorable to Plaintiff, no reasonable factfinder could conclude that Defendants intentionally discriminated against Plaintiff based on his race, gender, and/or age.  Accordingly, Defendants' Motions for Summary Judgment are granted.

<u>*   *   *   *   *   *   *   *   *   *   *</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Jeffrey M. Opsatnik, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-81 |
| | ) | |
| Norfolk Southern Corp., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge

## <u>ORDER OF COURT</u>

AND NOW, this 20th day of March, 2008, after careful consideration of the submissions of

the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered that

Defendant Norfolk Southern Corporation's Motion for Summary Judgment (Docket No. 43) and

Defendant BLET's Motion for Summary Judgment (Docket No. 42) are GRANTED.

The case will be marked "CLOSED" *forthwith*.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
Chief U.S. District Judge